Mr. Kohler for the petitioner, Mr. Broker for the respondent. Good morning and thank you. The reason for this appeal is because the Commission has departed from existing law and placed an improper and impossible burden on construction employers regarding the degree of supervision required under the Occupational Safety and Health Act. The primary issue presented by this appeal is whether, under OSHA, an employer is required to review the basic work tasks performed by craftspersons. In this case, the reviewing and reading of blueprints by an electrician. Under the Commission's view, the failure to do so automatically imputes knowledge of a violation by that individual, without requiring proof of foreseeability, which is the rule in five out of six circuits. The decision of the Commission, if left undisturbed, would essentially require construction employers to review every task that a licensed or skilled craftsperson performs on a job site to make sure they've done their task correctly, which is not the burden under OSHA. What's wrong with the basic rule that knowledge of a supervisor can be imputed to the employer? There's nothing wrong with that as long as it requires a showing by the secretary of foreseeability. There has to be... No, no, no. I left out foreseeability. What's wrong with that rule? Yeah. A supervisory employee knows or should have known of the danger. There's two problems. Under common law of agency, you would impute the knowledge of any employee, and here we're just talking about supervisory employees. There's two problems with that. First, the courts that have looked at that and rejected that idea has found that it's strict liability, which is impermissible under OSHA. The other policy reason... It's a negligence standard. It's whether a supervisor should have known of the danger or of the violation. It's not just violation. It's should have known. Yes, Judge Katsas, it is a negligence standard, but it's not the appropriate standard because it imposes... Well, it does impose strict liability and not negligence unless you show that there was some duty violated, and here, what you're talking about is a mistake on behalf of an electrician in performing the tenets of their trade. The policy issue behind not requiring automatic imputing of liability is it discourages employers from doing anything. If they know they're going to be liable, no matter what they do or how proactive they are or any diligence they take to prevent violations and prevent errors on work sites, it would discourage them from doing anything because they're going to be automatically liable. It makes supervisors take reasonable care. It makes them take... Well... Which is the standard for constructive knowledge. But that's not the correct standard, and that's not what five out of six circuits have said for that... I don't know why you would say that it discourages employers from doing anything because isn't that just basically what happens in all of tort law? And I don't think we generally think of tort law as discouraging employers from doing anything vis-a-vis their supervisors. This is not tort. This is statutory regulation of an employer through specific regulations. I guess my point was just a little different, which is just that if that regime... I take your point that this is not tort, and therefore you could have a different regime here. I took the premise of the question being put to you that why don't we have the same regime, and it just doesn't... I was puzzled by the answer that we don't have that regime because then no employer would have any incentive to do anything because that just seems like an indictment of all of tort law, unless I'm... Was misunderstanding what you're saying. Well, this is very different from tort law in that OSHA promulgates thousands of regulations which employers go out and become familiar with and then train their employees. It has a whole scheme in place. It's different from the common law duty, breach of duty, causation type structure in the civil setting and the assessment of damages. You actually have, under OSHA, you have the potential for criminal violations due to egregious cases, so it's very different. The standards are very different than in the tort setting where you don't have exposure to criminal liability. This case arose out of an incident that happened on October 18th, 2014, where Wayne Griffin, the employer in this case, was... One of their employees came in accidental conduct with an energized bus bar. The reason that occurred was twofold. One, during an MOP process where the owner of the facility had designated a team to prepare work procedures to perform the work, they failed to identify one of the electrical feeds to that bar, to that bus bar, so it was live. It would have been discovered had the foreman on site, Keith Pachocki, had he used his tester and complied with Wayne Griffin's test-before-you-touch policy and tested not only the equipment they were going to work on but also the equipment with which they could come in accidental contact. The policy states very clearly, don't rely on blueprints, don't rely on anything else. Test not only the area you're going to touch, but test the area that you could come in an accidental contact with. What happened to the injured employee is they raised up when they were trying to unbolt the cabinet and his face struck a cabinet that was energized, that was in the zone where they could be working. You're all familiar with the standard review of an agency decision. It's arbitrary, capricious abuse of discretion as to legal issues, substantial record evidence as to factual issues. And there was a factual finding of foreseeability. So even if we accept your premise that that is an element for imputing knowledge, you would have to show that that finding is not supported by substantial evidence. That's correct. That seems like a heavy lift for you. Well ordinarily it would be, but I think we clear that bar in this case because that finding is based on a nonexistent obligation for higher level supervisors to go back and read the blueprints to make sure that Mr. Pachocki had read the blueprints correctly. That's not the burden under OSHA. That would require an employer to go back and redo the work done by a licensed electrician. He's licensed in two states. He has 18 years experience. He had to know how to read blueprints to get a license. The commission said he knows how to read blueprints in their decision. They also said his error was obvious. They used the word obvious. So if you can't rely on an electrician to do his job correctly and you're automatically liable for any error they make when you didn't do something else, like you were on notice that they didn't know what they were doing, they had committed violations before, or you did something else wrong as an employer, you essentially have to go behind your craft employees and redo all their work. You can't do that in business. That's never the intent of OSHA and they've never imposed that kind of burden on employers before. In the cases that we rely upon, when they talk about supervising and supervising the performance of their trade, not they're performing their craft work, they're talking about they're performing a safety function like eyewear, fall protection. There is a duty to supervise there to make sure they have the correct. Why can't the decision be supported on the ALJ's much narrower theory, which is that in the circumstances of this case, it was foreseeable that there would be special issues arising from the circumstance that Fidelity controlled the switches? Because it still comes down to, I think that's a red area. It still comes down to the way you identify the circuits, regardless of who's responsible. You're the company and you're doing the work and it's some other folks who are controlling whether what's energized and what's not. But Judge Pomeroy said we had the duty to read the blueprints, which we did. We did read the blueprints, but we read them wrong. Keith Pachocki missed, along with the person who drew the blueprints, who worked for the engineering company, who was in the room the entire time, they missed that connection. Let's assume we're responsible for that. It's not foreseeability. The narrow finding that it was foreseeable because of this MOP procedure, it's no different from any other procedure, where you read the blueprints, you read them to determine what connections need to be disconnected. It actually hurts OSHA's case here because it would be less likely for us to need to review Mr. Pachocki's work when we knew that we had all these experts, this dream team of electricians in the room, with them to help find this error, this connection, including the person who actually drew the blueprints, who doesn't work for us. I'm out of time, unless you have any more questions. Thank you. Thank you. Good morning.  Today, because a Griffin employee, Mr. Brian Jusko, suffered a severe electrocution injury when his face came into contact with an energized bus bar in a compartment that he was working on in an electrical substation. This accident occurred because Griffin clearly violated two OSHA standards. It permitted its employees, Mr. Pachocki, the foreman at the worksite, and Mr. Jusko, to work within reach of an energized and unguarded bus bar, and that exposure occurred because it took a reasonably diligent effort to assess the workplace and to identify that there were live parts before allowing them to work there. This happened because Mr. Pachocki relied on an assumption rather than making inquiries. Mr. Peace, the project supervisor at Griffin, delegated this entire method of procedure process to Mr. Pachocki. He didn't give him any instructions on how to create these method of procedure documents. He oversaw his work exactly zero, in his words. He did not monitor his compliance with Griffin's rules, and he also didn't assign anyone, including himself or other educated foreman, the responsibility to check those method of procedure documents to make sure that he had actually made the inquiries necessary to identify live parts. The problem is he didn't take action to find the bars. And then, as he was executing that method of procedure document, he and his subordinate, Mr. Jusko, mutually failed to test parts of the work area that they could inadvertently contact. So what you've just been describing is what Pachocki didn't do, right? That's correct. Mr. Pachocki relied on an assumption. His testimony was when he created the method of procedure document, he didn't testify that he looked at blueprints and read them wrong. What he said was he relied on an assumption that the bus duct that connected the work station to another substation could not be energized, because he believed that non-commissioned equipment wouldn't be energized. So the ALJ's opinion has a good measure of that kind of rationale in it, which is that Pachocki made some mistakes. But then it also has a good measure of material in it about Griffin's actions vis-a-vis Pachocki. And so there's kind of a mishmash of things, it seems to me, between what Griffin, the and what Pachocki did vis-a-vis the condition, which gave rise to the injury. From your perspective, were both of those relevant to the analysis? Was one of them doing more of the driving work? Well, I think it's both. I think that Griffin's negligence in creating a safety program and providing instructions to Mr. Pachocki so that he would know how to do his work, so he understood the rules that applied to him at the work site, that's Griffin's failure. And Griffin delegated this assignment to Mr. Pachocki, and then it was his mistakes that he wasn't prepared to do this work, but then he made these mistakes that led to the actual exposure at issue. So Pachocki's mistakes alone wouldn't be automatically imputed to Griffin for purposes of giving rise to a citation for a violation of the... Well, it's not Mr. Pachocki's mistakes that are imputed, it's Mr. Pachocki's knowledge. And it's his knowledge of the electrical connection between the work area and the substation that he knowingly didn't turn off. So he has not only his knowledge of his own exposure to these live parts, but he also has his knowledge of Mr. Giusco's exposure to live parts. And that was a footnote that we added to distinguish from these cases that Griffin has brought up where some circuits have said you need to make this foreseeability finding if you want to impute a supervisor's knowledge of his own misconduct to the employer. It doesn't really come into play here, both because he's working with Mr. Giusco, so you can impute Mr. Pachocki's knowledge of Mr. Giusco's exposure to live parts to the company. And then we also have other independent grounds of knowledge here. We have Mr. Peace's constructive knowledge of the violative condition, and we also have constructive knowledge on the basis of an adequate safety program. So if Pachocki should have known of the danger, and if to take your opponent's position, if a company can reasonably just leave this kind of checking to a front-level supervisor and say, look, you know, Peace is focused on much broader responsibilities, so nothing wrong with leaving this to Pachocki, but Pachocki should have known of the danger. Do you win or lose on those assumptions? I think if I remember, if I got those assumptions correctly, I think, well, we win, because in that case, there was another way of getting that. Right. If you're saying... Judge Srinivasan's question of whether Pachocki's knowledge by itself is sufficient or imputation. It is, yes. And that's the commission's test, that's the test that the Seventh Circuit took recently in the Dana container case that has been cited in our brief. In those cases, this court's had a national realty that a supervisor has, if anything, a heightened responsibility to ensure that its supervisors don't engage in misconduct. And in those cases, they look at that language and they say, this means an employer, there's an inference that an employer's safety program is inadequate where a supervisor is engaging in misconduct, because you haven't communicated to him what he's supposed to be doing and or he doesn't fear reprisal from breaking the rules. So here, Mr. Pachocki clearly didn't understand his responsibilities, he didn't understand how to comply with the no live work policy, he was working at a work site that had unique conditions where he had never before worked at a project where another party was in control of physically turning on and off the circuit breakers, that increased the risk that someone could activate a substation that he thought would be off when, in fact, it would be on. And that's why it was so important for him to make inquiries before working to make sure that his assumptions were correct, which is what he failed to do. Additionally, as... The ALJ made quite a bit of the unusual circumstances of divided responsibility. Right. But this was the 51st MOP, so 50 times this had been done without difficulty, without incident. So isn't that... At some point, isn't it no longer new and unusual circumstances to have been doing this for a while? I think the issue there is that there weren't specific rules given to him to avoid the exact situation that happened here on the 51st iteration. The fact that it didn't happen before is very fortunate. However, the issue is that knowing that there were these atypical circumstances, Griffin could have foreseen that he would at some point during this process, as he's writing through these procedure documents, he might rely on an assumption as opposed to making the sort of inquiries that he should be making to verify that parts were either on or off. That sure sounds like 2020 hindsight. Griffin should have anticipated that this precise problem would arise. Well, it's not so much this precise problem as knowing that this is an atypical circumstance. And there are some cases in the record where the commission has recognized... So it's no longer atypical after 50 successful iterations? Well, I think it relates to the reliance on his expertise. And so this is Griffin's argument, is that, well, we're able to rely on the expertise of an expert foreman. And there are several cases in the record that says, well, no, you're not allowed to fully shift your responsibility as employer onto even an expert employee, because that employee needs to be given work rules that are going to be able to educate them on what they need to do to keep themselves and their crew safe. And they also need to monitor their compliance with those work rules in some way to make sure they actually do understand what they're supposed to do and are following the rules. So there are several cases to that effect. Caterpillar from the Seventh Circuit, Dana Shook from the Sixth, American Sterilizer and Paul Betty from the commission. All of these say that you need to provide some sort of specific work rules that are going to let you know how to operate in this work environment. Why can't this all be boiled down to the specific work rule of a test before you touch? And he didn't. So the test before you touch, several things on that. It's clear that it wasn't understood is the main issue. Mr. Pachocki's testimony revealed that he didn't understand that he was supposed to touch parts of inadvertent contact. We know that Mr. Jusko didn't understand it either, because he also didn't test parts of inadvertent contact. Why isn't that sufficient for your case? I think it is. But I think we're also responding to the arguments that Griffin has made with regard to why it doesn't need to oversee Mr. Pachocki. Those are, in fact, the rules that they have said would have prevented this. Those were the rules. They were laid out. They were clear. And yet they weren't understood. So there was a problem in terms of clear communication. Yes, I would agree with you that there wasn't clear communication. I would disagree that they were clear on their face, if you actually look at it. Test before you touch? Well, it doesn't anywhere say specifically test areas that you could inadvertently contact. But that's beside the point. Well, it does say in the reg that you could be in contact with. It says one of the risks you will mitigate by testing equipment is touching inadvertent areas of contact. This is getting a rather – it's a little granular point. It deals with an electric power circuit, exposed or concealed, so located that the performance of the work may bring any person into contact. Oh, that's the standard. Yes. That's right. Yes. Yeah, I agree with you, sir. I mean, he's in this space. It's right – this wouldn't have happened if it weren't something that could have – That's right. Yes. Right, right. And as to the policy, I'm out of time. I'd just like to clarify that Griffin's arguments are inconsistent about whether Mr. Jusko engaged in this conduct. They haven't given a clear explanation as to whether Mr. Jusko was supposed to test anything on the day of the accident. This is outlined in the record in our brief. It just goes to prove that this instruction that they gave was not well understood by the employees. They didn't know how to comply. Thank you. Thank you. Mr. McCullough, we'll give you two minutes if you have anything, by way of rebuttal. Thank you. I want to address the test-before-you-touch policy, because that goes two ways. One, it's part of – if they want to prove foreseeability by a lack-safety program, they have to say more – they have to show more than one individual may have – and it's not clear from the record whether he misunderstood it or not – may have not comprehended that the policy applied to areas of incidental contact, because the record is clear, and OSHA and the Commission acknowledge that the policy says right on its face, you not only test direct areas of contact, but areas of potential incidental contact, and it also says why you do that – because of the risk of the blueprints being wrong or accidentally contacting those areas. Mr. McCullough, he didn't say that I failed to test it because I didn't think I would come into contact with it. He said because it had not been commissioned, right? He said – He thought it couldn't be energized because it wasn't commissioned. I don't believe – no, he wasn't anticipating being on that area. I don't believe – Well, here's his testimony. Did you ever discuss with any party whether you should add a step to MOP-51 to open the tiebreaker? No. No? Why not? Because when we finished 41A, the tie bus was not installed yet, so it wasn't commissioned. That's why. It doesn't matter if he thinks it's commissioned, if he thinks it's live, if he thinks it's not live. The whole purpose of test before you touch is because it could be. Somebody could have come back while last time you worked on it and turned it on. That's the whole purpose of test before you touch. And in light of everything that was positive about what was done, his one – if it's a misunderstanding about that, the policy was clear. The training was done multiple times on the site where the policy was gone over in detail about this is what it covers. It was done in employees' annual reviews. It was done on-site training. It was done during – Well, you're trying to portray him as something of a rogue employee because of that, but it I'm not saying he did it on purpose. It was certainly an accident, but that's the kind of thing that the employer is not responsible for unless it's foreseeable. Well, when he says, I didn't test it because it hadn't been commissioned, that is on purpose. I'm sorry? That is something he did on purpose. He got a reason it hadn't been commissioned. That's true. That's a conscious decision he made not to test it if that was the reason he did it. That's not foreseeable. An electrician is supposed to follow our test before you touch and test everything, whether you think it's commissioned, whether you think it's ever been turned on or not been turned on. Thank you. Thank you. Thank you, counsel. The case is submitted.
judges: Srinivasan, Katsas, Ginsburg